WIENER, Circuit Judge, Specially Concurring:
Given the stage of the proceedings in the district court at which summary judgment was rendered in favor of Evanston, denying coverage of the claims advanced against Hall in the two underlying state court cases, I cannot get too exercised about remanding the case for further proceedings. So, I do not dissent. I do believe, however, that remand will accomplish nothing more than the expenditure of time, effort, and funds by the parties and the waste of judicial resources at the district court level. This is because I am convinced that on remand the district court’s original judgment will be replicated.
As noted above in our per curiam opinion, the Policy was issued to cover commercial contracting operations, including roofing, by an experienced and sophisticated commercial construction company with a long roofing history; and the nature of the Policy and the coverages for which it was issued make clear that at least some of the undefined terms used in the policy must be interpreted as they are understood in the commercial construction and roofing industry. Our per curiam opinion also recognizes that, despite Hall’s contention, the wording of section 3 of the Roofing Endorsement is not subject to the doctrines of ejusdem generis, noscitur a sociis, or any other canon of construction that would cause the exclusion of coverage of “any operation including ... membrane roofing” to be modified or in any way affected by the finite list of heat-related *314 applications listed in that exclusion. And there are no other words of qualification or limitation to be found anywhere in the Policy that would limit or restrict the meaning of “membrane roofing” to only those operations that involve application by fire or heat and thereby insure Hall (rather than excluding coverage) for its membrane roofing operation that was being applied “cold” when the fire broke out on the UTA project.
Neither could a total exclusion of coverage of membrane roofing operations be deemed overbroad or absurd when viewed in light of the very construction accident that produced the instant claims. Hall’s supervisory employee in charge of the UTA job testified that Hall’s “cold” application (1) was a membrane roofing operation—a fact acknowledged by Hall’s principal owner and operator and by Hall’s expert witness—and (2) involved the use of a flammable adhesive that emitted flammable fumes, which apparently ignited when sparks from another subcontractor’s operations fell in their vicinity. So Evanston obviously knew what it was doing when it excluded not just any roofing operation, membrane or otherwise, that involved fire or heat applications, but also any and all membrane roofing operations, regardless of the method of application.
The intent of the parties to exclude insurance coverage of all membrane roofing becomes pellucid when section 3 is interpreted under the venerable canon of construction that instructs us to presume that the drafters would not include unnecessary words or phrases that are merely repetitious or surplusage. If the Roofing Endorsement had been intended to exclude coverage of only those membrane roofing operations that were installed with the use of heat or fire or flame, it would indeed be redundant to expressly exclude membrane roofing in section 3 immediately after having expressly excluded any roofing operations involving heat, flame, torch, wand, etc. Obviously, the exclusion of all heat-related installations automatically excludes membrane roofing operations involving fire or heat. So, adding the unmodified term “membrane roofing” following the list of excluded flame and heat installations is meaningful—and not unnecessary surplus-age or repetition—only if the exclusion of membrane roofing is intended to encompass all such operations, “cold” as well as “hot.”
Finally, the record on appeal confirms that there are other categories of roofing operations that are not membrane roofing operations—metal and tile, to name but two others that were acknowledged by Hall. As membrane roofing is thus not an all-encompassing term, there can be no serious contention that an exclusion of all membrane roofing—whether applied hot or cold—would somehow swallow coverage and thus require a judicially imposed limitation that is nowhere to be found in the policy, i.e., judicially restricting the exclusion of membrane roofing operations to those employing heat or fire and thereby not excluding insurance coverage for Hall’s “cold” operation.
In summary, Hall’s acknowledgment that it was engaged in commercial membrane roofing operations at the time of the incident in question coupled with our determination that nothing in the policy either defines membrane roofing or restricts that term to include some but not all such operations, viz., heat but not cold, I cannot imagine what can come out on remand by way of expert testimony that could mystically require or even justify a court’s limiting the exclusion of coverage of membrane roofing operations to those involving fire *315 or heat in their installation.[1] My admittedly belabored poiiit is that, however well-intentioned, our overly conscientious caution in remanding this case for further consideration of the meaning of membrane roofing within the construction and roofing industry will almost certainly prove to have been a hollow act.

. Hall's expert testified that he is a member of the Construction Specifications Institute (CSI) which, among other things, jointly (with Mc-Graw Hill) promulgates the so-called Sweets Catalog, specifically, the Master Format Reference Guide. That multi-volume set is universally recognized in the construction industry as an encyclopedic work, and a quick skimming of its index makes clear that there are numerous categories of commercial and industrial roofing operations, such as shingles and shakes, metal roof tile, slate shingles- and, yes, "Membrane Roofing"-to name but a few. Sweets further reflects that there are additional specialized roofing operations that employ "membranes" in the dictionary sense but are not deemed "membrane roofing" in the trade, such as tensioned fabric structures (like the Denver International Airport), greenhouses, swimming pool enclosures, and solariums.